[No. 60000-7. En Banc. February 24, 1994.]

*In the Matter of the Personal Restraint of* BRIAN
KEITH LORD, *Petitioner.*

300

*Peter A. Camiel* and *Mair, Camiel & Kovach*; *Sheryl Gordon McCloud*, for petitioner (appointed counsel for appeal).

*C. Danny Clem, Prosecuting Attorney* and *Pamela B. Loginsky, Irene K. Asai, Jeffrey M. Wolf*, and *Donald J. Porter, Deputies*, for respondent.

DURHAM, J. — Petitioner Brian Keith Lord brings this personal restraint petition (PRP) challenging his aggravated first degree murder conviction and death sentence. We deny the petition and remand for immediate issuance of a death warrant in accord with RCW 10.95.160(2).

Lord was convicted in 1987 of the rape, kidnapping, and aggravated first degree murder of 16-year-old Tracy Parker. The jury found insufficient mitigating circumstances to merit leniency, and Lord was sentenced to death. A summary of the pertinent facts can be found in *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992). Lord's conviction and death sentence were affirmed. *Lord*, at 837. Through new counsel, Lord now files this PRP and supplement which raises some 67 issues, many of which are repetitious of those rejected in his initial appeal.

After addressing the standard of review for personal restraint petitions, we will address each of Lord's new claims in chronological order, beginning with pretrial issues and continuing through the penalty phase. Pertinent facts will be set forth in connection with the particular issues to which they relate. The issues already considered in Lord's direct appeal will be dealt with last.

Before beginning our analysis of the substance of Lord's petition, however, we must comment on its scope. The PRP filed by Lord's appointed counsel is 387 pages long and includes a 430-page appendix. In response, the State filed a 333-page brief along with an additional 400 pages of appendix. Lord then filed a 50-page reply brief. These briefs are in addition to those filed on the direct appeal, as well as the numerous motions filed in connection with this action.

The "process of 'winnowing out weaker arguments . . . and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy". *Smith v. Murray*, 477 U.S. 527, 536, 91 L. Ed. 2d 434, 106 S. Ct. 2661 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (1983)). Here, appointed counsel has thrown the chaff in with the wheat, ignoring their duty under RPC 3.1 to present only meritorious claims and contentions and leaving

it for this court to cull the small number of colorable claims from the frivolous and repetitive.[1] In all, the 1,200-plus pages of briefing filed here far exceeds zealous advocacy and borders on abuse of process. We hereby provide notice that such behavior *will not* be tolerated in the future.

## STANDARD OF REVIEW

 As a threshold matter, it is important to note that a personal restraint petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue. *In re Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986). The petitioner may raise new issues, however, including both errors of constitutional magnitude and nonconstitutional errors which constitute a fundamental defect and inherently result in a complete miscarriage of justice. *In re Cook*, 114 Wn.2d 802, 812, 792 P.2d 506 (1990); *In re Hews*, 99 Wn.2d 80, 87, 660 P.2d 263 (1983). To obtain relief with respect to either constitutional or nonconstitutional claims, the petitioner must show that he was actually and substantially prejudiced by the error. *In re Cook, supra* at 810; *In re St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992). To obtain an evidentiary hearing, the petitioner must demonstrate that he has competent, admissible evidence to establish facts which would entitle him to relief. *In re Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992).

## PRETRIAL ISSUES

 1. Information. Lord claims that the amended information is defective because it charges him, in one count, with aggravated first degree murder "and/or" first degree felony murder. Clerk's Papers (CP) (Mar. 15, 1988), at 200. Lord does not claim the information omitted any of the elements of either of these crimes. Rather, he claims the "and/or" language rendered the information invalid under

---

[1] We recognize that claims must often be brought first in state court in order to be cognizable in a later federal habeas corpus petition. Nonetheless, a claim which is adjudged frivolous in state court will not suddenly develop merit merely from a change in jurisdiction. Counsel do a disservice to their clients and the courts by taking a shotgun approach to appellate and postconviction advocacy.

*State v. Golladay*, 78 Wn.2d 121, 470 P.2d 191 (1970). In a challenge to this information, Lord has the "burden . . . to establish the charging document failed to notify him he might be convicted [of either felony murder or aggravated murder] and that the failure to so inform him prejudiced him in the preparation of his defense". *In re St. Pierre, supra* at 329-30.

 *Golladay* is not on point. The defendant there was accused of first degree murder committed with premeditated intent, and the information charged two different means of committing the offense. The jury returned a general verdict of guilty. This court reversed the conviction because there was insufficient evidence to support one of the means. However, aggravated first degree murder and first degree felony murder are not different means of committing the same offense, nor are they greater and lesser offenses. *State v. Irizarry*, 111 Wn.2d 591, 592, 763 P.2d 432 (1988). They are, rather, two different offenses. *Irizarry*, at 593-95. Thus, for the jury to be instructed on both offenses, the State must include both charges in the information. *Irizarry*, at 594-95. This is precisely what the State did here. Neither separating the charges into two counts nor using "and" instead of "and/or" would have provided any additional or better notice to Lord or his attorney that Lord was accused both of felony murder and aggravated murder.

██ 2. Death Penalty Notice. Lord claims the death penalty notice is invalid because it was filed the same day as the amended information charging him with aggravated first degree murder. Lord argues that the timing of the notice proves the Kitsap County Prosecutor does not exercise discretion in seeking the death penalty, but does so automatically upon the filing of an aggravated murder charge.[2]

---

[2]Many capital defendants (including Lord on direct appeal) have unsuccessfully challenged death penalty statutes on the ground that the subjective nature of the decision and the consequent existence of prosecutorial charging discretion render the statute unconstitutional. *See State v. Lord*, 117 Wn.2d 829, 915-16, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992). This argument was specifically rejected in *State v. Dictado*, 102 Wn.2d 277, 297, 687 P.2d 172 (1984) on the ground that the prosecutor "must file a notice of a special sentencing proceeding" if he or she determines there is reason to believe there are insufficient mitigating circumstances

This issue is patently frivolous. The decision to impose the death penalty requires the prosecutor to make the "subjective determination of whether there is 'reason to believe that there are not sufficient mitigating circumstances to merit leniency' ". *In re Harris*, 111 Wn.2d 691, 694, 763 P.2d 823 (1988) (quoting RCW 10.95.040), *cert. denied*, 490 U.S. 1075 (1989). Although a policy of seeking the death penalty in every aggravated murder case would be an abrogation of that duty and, in that sense, an abuse of discretion, *see Harris*, at 693-94, Lord has made no showing that the Kitsap County Prosecutor does in fact seek the death penalty in every aggravated murder case.

3. Venue. Lord claims the trial court erred in changing venue from Kitsap County to Pierce County rather than to a county in eastern Washington where the victim's disappearance and murder had not been so heavily publicized. Lord's argument is without merit. The parties did not experience any publicity-related difficulty in selecting a jury in Pierce County. Few of the 55 prospective jurors who were questioned recalled any details about the case, and those who did generally recalled only the initial search for a missing girl. Most of the questioning on voir dire dealt with the jurors' attitudes toward the death penalty. Even with the challenges for cause granted on that issue, and the parties' 30 peremptory challenges, a panel of 12 jurors and 3 alternates was selected after questioning only 55 members of the venire. The trial court did not violate Lord's rights by holding the trial in Pierce County. *See State v. Rupe*, 108 Wn.2d 734, 750-52, 743 P.2d 210 (1987) (capital defendant validly retried in Thurston County, where crime and first trial had both occurred), *cert. denied*, 486 U.S. 1061 (1988).

4. Waiver of Presence. Lord claims he did not validly waive his right to be present during the April 28 and May

---

to merit leniency. To comply with that holding, a prosecutor must evaluate the evidence in each case and determine if there is reason to believe there are insufficient mitigating circumstances to merit leniency.

20, 1987, proceedings and during numerous unspecified in-chambers hearings and sidebar conferences. Lord also contends that a capital defendant cannot waive his right to be present and that, even if such waivers are permissible, the record does not show he made a knowing, intelligent, and voluntary waiver.

The core of the constitutional right to be present is the right to be present when evidence is being presented. *United States v. Gagnon*, 470 U.S. 522, 526, 84 L. Ed. 2d 486, 105 S. Ct. 1482 (1985) (per curiam). Beyond that, the defendant has a "right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge . . ..'" *Gagnon*, 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934)). The defendant therefore does not have a right to be present during in-chambers or bench conferences between the court and counsel on legal matters, *United States v. Williams*, 455 F.2d 361 (9th Cir.), *cert. denied*, 409 U.S. 857 (1972), at least where those matters do not require a resolution of disputed facts. *People v. Dokes*, 79 N.Y.2d 656, 595 N.E.2d 836, 584 N.Y.S.2d 761 (1992) (right to be present during hearing on admissibility of prior conviction).

All of the proceedings during which Lord was absent meet that description. During the pretrial hearing on April 28, 1987, the court deferred ruling on an ER 609 motion, granted defense counsel's motion for funds to get Lord a haircut and clothing for trial, settled on the wording of the jury questionnaires and the pretrial instructions, and set a time limit on the testing of certain evidence. During the May 20, 1987, proceeding, the court announced its rulings on evidentiary matters which had previously been argued, ruled that the jurors could take notes, and directed the State to provide the defense with summaries of its witnesses' testimony. To the extent the various sidebar conferences and in-chambers hearings can be identified, they too involved only discussion between the court and counsel on matters of law. Lord had no constitutional right to be

present during any of these proceedings.[3] Prejudice to the defendant will not simply be presumed. *Rushen v. Spain*, 464 U.S. 114, 117-20, 78 L. Ed. 2d 267, 104 S. Ct. 453 (1983) (per curiam); *see also State v. Rice*, 110 Wn.2d 577, 615 n.21, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). Lord does not explain how his absence affected the outcome of any of the challenged proceedings or conferences, nor can we find any prejudice.

▪ 5. "Ex Parte" Contacts. Lord claims the trial judge had improper ex parte contacts with nonparties regarding discovery matters. This issue is patently frivolous. With both parties' consent, the trial judge contacted the attorney for the Washington State Patrol in an attempt to facilitate the production of documents regarding an internal investigation into the State Crime Laboratory's examination of certain evidence in Lord's case. Since these contacts were made with both parties' consent, and provided Lord with documents relevant to his cross examination of prosecution witnesses, we can find no prejudice. Moreover, ex parte communications by the trial judge can be held harmless. *Rushen*, 464 U.S. at 117-18.

JURY SELECTION

▪ 6. "Presumption of Life". Lord contends, without supporting argument, that the trial court erroneously prevented defense counsel "from asking jurors about the presumption of life". PRP, at 355. A juror in a capital case is subject to challenge for cause if his "views [on capital punishment] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 100 S. Ct. 2521 (1980)).

---

[3]CrR 3.4(b) says the defendant's voluntary absence after commencement of trial shall not prevent the trial from continuing "[i]n prosecutions for offenses not punishable by death . . .." Even under this court rule, the defendant "need not be present during deliberations between court and counsel or during arguments on questions of law". *State v. Walker*, 13 Wn. App. 545, 557, 536 P.2d 657, *review denied*, 86 Wn.2d 1005 (1975).

Whether conducted by the trial court or by the parties themselves, voir dire must be sufficient to enable the parties to identify "jurors who, even prior to the State's case-in-chief, had predetermined the terminating issue of [the] trial, that being whether to impose the death penalty". *Morgan v. Illinois*, ___ U.S. ___, 119 L. Ed. 2d 492, 507, 112 S. Ct. 2222 (1992). The trial judge is afforded considerable discretion in determining how many questions the parties may ask and how the questions should be worded. *Mu'Min v. Virginia*, 500 U.S. 415, 425-27, 114 L. Ed. 2d 493, 506-07, 111 S. Ct. 1899 (1991).

The record shows that each prospective juror was repeatedly informed, during the voir dire process, of the State's burden of proving insufficient mitigating circumstances to merit leniency. *See, e.g.*, Report of Proceedings (RP), at 30-31, 94. Counsel were permitted to question all of the jurors regarding their understanding of this concept and willingness to follow it. Lord does not explain how this procedure was inadequate to enable counsel to ascertain the jurors' views regarding "the presumption of life" or why it was essential to ask that specific question. The court's own questioning and that permitted by counsel was clearly adequate to enable both parties to intelligently exercise their challenges based on jurors' views of the death penalty.

7. <u>Challenge for Cause Denied</u>. Lord also claims the trial court erroneously denied his challenge for cause to juror James Raymond. Raymond said he was "for the death penalty". RP, at 660. When asked if he would be absolutely committed to vote for the death penalty before the penalty phase began, however, he said "[n]o". RP, at 663. He also answered "[n]o, ma'am" when asked if his views regarding the death penalty were such that he would automatically vote for that penalty without regard to the evidence developed during trial. RP, at 663. Raymond stated he would be willing to consider mitigating circumstances presented or argued in the penalty phase, and he could not think of any particular type of case in which he could not consider mitigating factors.

 Both the defense counsel and the prosecutor conducted extensive voir dire on juror Raymond. The defense twice challenged him for cause. However, his testimony indicates that Raymond was somewhat confused about the 2-stage process in capital cases. Once this was clarified, Raymond was able to explain, "the first phase is solely for the prove-him guilty and the second part is for the sentence, which I didn't clearly understand before, but now I do, and that's when the determination would be to decide, either death or life in prison". RP, at 695. He also said he was "not going to base everything on my personal opinion" regarding the death penalty or allow it to "override my judgment". RP, at 695.

The trial court concluded that Raymond "would be open to all the facts presented during [the penalty] phase" and was not, therefore, subject to challenge for cause. RP, at 697. Since that conclusion is based on the court's application of the correct rule of law and its assessment of Raymond's demeanor and credibility, it must be given considerable deference. *Wainwright*, 469 U.S. at 427-29. Although Raymond's initial understanding of the procedures involved in a capital trial was confused, the record as a whole demonstrated that his "views [on capital punishment] would [not] 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. at 45). The trial court's ruling is not, therefore, erroneous.

 8. Challenges for Cause Not Made. Lord next claims that defense counsel represented him ineffectively by failing to challenge jurors Richard Birnel, Gary Kopf, and Patricia Raether based on their views regarding the death penalty. Lord was not prejudiced by counsel's failure to challenge these jurors unless such challenges for cause would have been granted. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986) (to prevail on ineffectiveness claim involving counsel's failure to raise legal issue, defendant must show that issue has merit). As explained above, such a challenge need only be granted if it

is obvious that the juror's views on capital punishment would prevent the performance of his or her duties in accordance with the instructions and oath. *Wainwright*, 469 U.S. at 424.

Juror Birnel said he "wouldn't be convinced ahead of time" either for or against the death penalty, indicated that he would give consideration to all mitigating circumstances, and could only "reluctantly" vote for the death penalty if the State proved there were insufficient mitigating circumstances to merit leniency. RP, at 715, 716, 721. Originally, Birnel indicated his initial support for imposition of the death penalty for premeditated murder committed to conceal a rape or kidnapping. However, following an explanation of the instructions that would be given in the case, Birnel indicated he would not vote for the death penalty unless "the prosecutor proves there are no mitigating circumstances . . .." RP, at 731. Later, defense counsel asked Birnel if he would start out committed to vote for the death penalty after the State proved premeditated murder. RP, at 734. Birnel said "no" and explained that there would be a penalty phase and he "would have to listen and see what the State has to say, if they prove it or don't prove it". RP, at 734-35.

Similarly, in response to a question from counsel, juror Kopf said he would automatically vote for the death penalty if Lord was convicted of premeditated murder done during a kidnapping or rape. RP, at 1008. When asked, "[w]ithout considering whether or not there's any mitigating circumstances?", Kopf answered, "[n]o, you have to" consider mitigating circumstances before deciding on a sentence. RP, at 1008.

Juror Raether also indicated in response to a question from defense counsel that she would vote for the death penalty for a person convicted of a premeditated murder. When informed of the law she would be required to apply, however, she said, "I don't want to take anybody's life from them, and once I knew what the law was I could probably put my feelings aside". RP, at 1297-98. She also answered

"[n]o" in response to the court's questions as to whether she was committed to the death penalty and whether she would automatically vote for the death penalty without regard to evidence developed at trial. RP, at 1281.

Each of these jurors evidenced an openness to consideration of all the facts, a fundamental acceptance of their duty to make an independent and thorough evaluation of the facts, and a willingness to follow their instructions and oath. Lord has not shown that a challenge to any of these jurors would have been successful.

9. Minor on Jury. Lord claims one of the jurors was 17 years old and therefore not qualified to act as a juror. This argument, which is based on what appears to be either an error in transcription or a misstatement by the prosecutor,[4] is patently frivolous. According to the juror questionnaires, the youngest person summoned for jury duty was born in 1964; the youngest of the panel was born in 1960, and was 27 at the time of trial. Thus, Lord's claim is baseless.

10. State's Peremptory Challenges. Lord claims the State's use of peremptory challenges to remove jurors who did not favor the death penalty denied him his right to a jury representing a fair cross section of the community. The Supreme Court has held that the equal protection clause of the Fourteenth Amendment prohibits the use of peremptory challenges to exclude members of a racial group.[5] *Batson v.*

---

[4]After the penalty phase verdict was received, Prosecutor Clem stated for the record "that the jury makeup was eight men and four women from seventeen to eighty-three". RP, at 7908.

[5]As Lord notes, one federal district court has held that the Sixth and Fourteenth Amendments prohibit the use of peremptory challenges to exclude jurors who are opposed to the death penalty. *Brown v. Rice*, 693 F. Supp. 381 (W.D.N.C. 1988). The Fourth Circuit reversed that holding, however, and held that the *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986) equal protection clause analysis applies only to challenges based on race. *Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989), *cert. denied*, 495 U.S. 953 (1990). Several other courts have reached the same conclusion. *People v. Marshall*, 50 Cal. 3d 907, 790 P.2d 676, 269 Cal. Rptr. 269 (1990), *cert. denied*, 498 U.S. 1110 (1991); *People v. Davis*, 794 P.2d 159 (Colo. 1990), *cert. denied*, 498 U.S. 1018 (1991). Thus, any equal protection challenge to this use of peremptory challenges would fail under the prevailing case law.

*Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). However, the Supreme Court has made it equally as clear that the Sixth Amendment, which protects the right to a jury representing a fair cross section of the community, does not apply to "groups defined solely in terms of shared attitudes" such as opposition to the death penalty. *Lockhart v. McCree*, 476 U.S. 162, 174, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986). Similarly, this court will not "invoke[] the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors . . .." *Lockhart*, 476 U.S. at 173.

11. Juror Misconduct. Lord contends that juror Manuel Rosario falsely answered voir dire questions regarding his awareness of pretrial publicity. On his written questionnaire, Rosario said he worked as a press operator for the Tacoma News Tribune. In response to the question, "[h]ave you heard anything about this case?" Rosario checked the box labeled "[n]o". PRP app. 53, at 9. He also answered "[n]o" to the question whether he had heard anyone talk about the case or express any opinion about it. PRP app. 53, at 9. During his individual voir dire, the court asked Rosario, "[n]ow that you've had a couple days to think about it, *do you recall hearing or seeing anything about the case?*" RP, at 412. Rosario said "[n]o, ma'am" and confirmed that he had not heard anything about the case except what had been described to the panel prior to voir dire. RP, at 412.

In February of 1993, defense investigator Paul Henderson telephoned Rosario and asked him several questions regarding Lord's trial. According to Henderson's affidavit, Rosario said:

> I was questioned about this during the jury selection. I said I had read about the crime in the Tacoma newspaper but I hadn't formed an opinion on the guilt or innocence. I had no in-depth background on the case — none whatsoever. I said this during the jury selection.

PRP app. 54. Henderson also states that "Mr. Rosario explained that he has worked for many years as a pressman for the Tacoma News-Tribune and further stated that he read accounts of the murder in that newspaper". PRP app. 54.

██ Henderson's affidavit would be hearsay to the extent it relates to Rosario's out-of-court unsworn statements. ER 801. A personal restraint petitioner "must present evidence showing that his factual allegations are based on more than . . . hearsay". *In re Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992).[6] Beyond the hearsay problem, there is also no indication that Rosario injected any previously withheld information into the deliberative process. To the contrary, Henderson's affidavit suggests that Rosario "had no in-depth background on the case" which he could have imparted. Any misleading or false answers during voir dire require reversal only if accurate answers would have provided grounds for a challenge for cause. *State v. Briggs*, 55 Wn. App. 44, 52-53, 776 P.2d 1347 (1989) (discussing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 78 L. Ed. 2d 663, 104 S. Ct. 845 (1984)). A juror is not subject to challenge for cause merely because he is aware of the facts of the case. *See Rupe*, 108 Wn.2d at 751 (fact that most of the venire remembered the case was irrelevant). Rosario's limited knowledge about the case would not provide grounds for such a challenge.

GUILT PHASE ISSUES

██ 12. Assistance of Counsel. Lord claims he was represented ineffectively in several respects both at the trial court level and on appeal. We have already considered numerous challenges brought by Lord relating to his representation at the trial court level, and find his challenges to that phase of his representation to be both repetitive and a transparent attempt to relitigate issues already decided on appeal. *See Lord*, 117 Wn.2d at 883-86. His challenge to appellate counsel, which we will consider, is simply that his attorneys did not raise all of the issues Lord now raises and that some of the issues which were raised were not argued in precisely the way Lord's present counsel

---

[6]Lord's attorneys claim they have been unable to comply with *Rice* because they voluntarily cut off attempts to contact Lord's jurors in response to a State's motion to preclude such contacts. However, there has been no court order precluding such contacts.

argue them. Failure to raise all possible nonfrivolous issues on appeal is not ineffective assistance, however. Rather, the exercise of independent judgment in deciding which issues may be the basis of a successful appeal is at the heart of the attorney's role in our legal process. *Smith v. Murray*, 477 U.S. 527, 536, 91 L. Ed. 2d 434, 106 S. Ct. 2661 (1986); *Jones v. Barnes*, 463 U.S. 745, 751-54, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (1983). *See also* RPC 3.1 (lawyer shall not bring claim upon frivolous basis). Moreover, in order to prevail on the appellate ineffectiveness claim, Lord must show the merit of the underlying legal issues his appellate counsel failed to raise or raised improperly and then demonstrate actual prejudice. *Kimmelman v. Morrison*, 477 U.S. 365, 375, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986). The claim of ineffective assistance on appeal thus adds nothing of substance to the personal restraint petition and appears only to have been made to permit Lord to renew claims that were raised in part or in another manner on direct appeal. Each of Lord's substantive claims is addressed elsewhere in this opinion. The effectiveness of Lord's appellate counsel requires no additional discussion.

13. Scope of Cross Examination. Lord claims defense counsel's cross examination of four prosecution witnesses (Don Phillips, Rex Harvey, Sonny Belgard, and Robert Machinski) was improperly limited. Lord's claims with respect to the first three of these witnesses were rejected on direct appeal, *Lord*, at 869-70, 873-75, and need not be discussed again now. The only new claim is that Lord should have been permitted to impeach Machinski with his Texas felony conviction.

Machinski tied Lord to the orange U-Haul blanket on which blood matching the victim's type had been found. Defense counsel wanted to impeach Machinski's credibility with his 1983 Texas conviction. In an offer of proof conducted by the prosecutor, Machinski admitted that he had been convicted of attempted burglary in 1983. He also said his civil rights had been restored when he was dismissed from probation in 1987. The court asked Machinski to get

whatever documents he had regarding the conviction during the next recess, "[m]eanwhile, defense cannot use his prior record". RP, at 3308. No documentation was produced, and Machinski's prior conviction was not admitted. Lord is now concerned because the order dismissing Machinski's probation says "[d]eft [w]itness in [m]urder [t]rial in State of Washington". PRP app. 29. Although nothing in the order indicates that Washington authorities were involved in the Texas proceedings, Lord suggests the dismissal of the Texas charge was a reward for Machinski's testimony and therefore evidence of bias or motive which the State should have disclosed.

█ As a threshold matter, it is questionable whether there was even a "conviction" for the trial court to have admitted as impeachment evidence under ER 609.[7] *Cf. State v. Dixon*, 17 Wn. App. 804, 565 P.2d 1207 (dismissed conviction not admissible for impeachment), *review denied*, 89 Wn.2d 1012 (1977). The trial court itself specifically excluded the evidence under ER 609(c), which renders inadmissible convictions which have "been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure . . .." Moreover, Machinski testified that, although he considered himself a friend of Lord's, he contacted the police on his own after reading a newspaper article about Tracy Parker's murder and the discovery of an orange blanket. Based on the evidence before it, the trial court does not appear to have committed any error on this issue.

█ 14. Other Possible Suspects. Lord claims the trial court erred in excluding evidence that (a) other individuals had refused to give hair samples or take polygraph examinations when the police asked them to do so, (b) one of Parker's neighbors owned a blue pickup truck which was not seen after Parker disappeared, (c) Parker's boyfriend wanted to have sex with her, (d) Parker had expressed

---

[7]The documents appended to the PRP show that Machinski was never in fact convicted of any crime in Texas. After he entered a plea of guilty, the Texas court placed him on probation and deferred further proceedings "without entering an adjudication of guilt . . .." PRP app. 29. His probation was dismissed on March 31, 1987.

concern about being followed by someone in a car, (e) several other persons had access to the U-Haul blanket and the residence in which Parker had last been seen alive. The trial court excluded this evidence under *State v. Mak*, 105 Wn.2d 692, 716-17, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), which holds that evidence connecting another person with the crime charged is not admissible unless there is a train of facts or circumstances which tend clearly to point to someone other than the defendant as the guilty party. *See also State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932); *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933). Lord does not explain how any of the above evidence tends to point clearly to anyone else as the guilty party.

15. Waiver of Right To Testify. Lord claims he did not validly waive his right to testify in the guilt phase. After the defense forensic expert completed his testimony, the court asked counsel if the defense had any other witnesses. Counsel said no. The court then asked if Lord was going to testify. Counsel again said no and explained that "we have spent a number of hours talking to Mr. Lord about his testifying, and, based on our advice, he is not going to". RP, at 7153. The court asked Lord if he understood that, if he chose not to testify, the jury could be advised not to consider that choice against him. Lord said he understood. He also confirmed that based on his attorneys' advice he had chosen not to testify.

Lord claims the trial court's "lack of adequate colloquy with [him] failed to ensure that his waiver" of his right to testify "was knowing and voluntary". PRP, at 235. As evidence that he did not wish to waive that right, Lord points to a portion of the allocution statement he made to the jury during the penalty phase. He told the jury he "didn't get to testify, my lawyers thought that was the wrong thing for me to do, which I wanted to but I was told not to, and I just would have liked to have been able to testify to be able to say my part of the story . . .." RP, at 7845. Lord asks this court to order an evidentiary hearing to determine if he voluntarily waived his right to testify in the guilt phase or was coerced to do so by his attorneys.

■ An evidentiary hearing would be required if the defendant "alleges . . . that his attorney actually prevented him from testifying in his own behalf". *State v. King*, 24 Wn. App. 495, 499, 601 P.2d 982 (1979). Lord does not allege that his attorneys "actually prevented" him from testifying, only that they told him it was the "wrong thing" for him to do. Moreover, for the court to discuss the choice with the defendant could intrude into the attorney-client relationship protected by the Sixth Amendment and might also appear to encourage the defendant to invoke or to waive his Fifth Amendment rights. *See United States v. Goodwin*, 770 F.2d 631, 637 (7th Cir. 1985), *cert. denied*, 474 U.S. 1084 (1986). It is counsel's responsibility, not the judge's, to advise the defendant whether or not to testify. Petitioner does not present any credible evidence of coercion and we see no need for a re-examination of his decision not to testify.

16. Guilt Phase Instructions. Lord claims the guilt phase instructions misdefined "premeditation" and did not preserve his right to a unanimous verdict. Lord's challenge to the court's premeditation instruction is patently frivolous. This pattern instruction, which set forth the statutory definition of premeditation, has already been held to be adequate. *State v. Benn*, 120 Wn.2d 631, 657-58, 845 P.2d 289 (1993); *Rice*, 110 Wn.2d at 603.

The unanimity issue was raised on direct appeal. Lord argued that the "to convict" instruction on aggravated murder did not ensure a unanimous verdict on all elements of the offense because the jury was not required to agree as to whether the crime had been committed during a first or second degree rape or attempted rape on the one hand or a first or second degree kidnapping or attempted kidnapping on the other. This court held that the jury's additional verdicts finding Lord guilty of felony murder based on both rape and kidnapping cured this deficiency. *Lord*, 117 Wn.2d at 876-81. Lord now argues that our analysis was flawed because a finding of first degree felony murder can rest on either a completed or an attempted first or second degree rape or

kidnapping, whereas aggravated murder requires a completed first degree kidnapping or first or second degree rape.

Lord is correct that the definition of first degree felony murder includes attempted crimes (RCW 9A.32.030(1)(c)), whereas the aggravating factor defined in RCW 10.95.020(9) does not. The jury expressly found that Lord committed the crime during the course or furtherance of a completed rape and a completed kidnapping. Felony murder can be founded upon a second degree kidnapping, whereas only first degree kidnapping constitutes an aggravating factor under RCW 10.95.020(9). In view of the jury's additional finding that Lord committed rape, however, the kidnapping would by definition be first degree. RCW 9A.40.020(1)(b) (kidnapping to facilitate the commission of another felony is first degree).

As the State notes, the other aggravating factor charged and instructed here is that the murder was committed to conceal the commission of "a crime" or to conceal the identity of any person committing "a crime". RCW 10.95.020(7). This factor includes any crime, including attempts and second degree kidnapping. *See In re Jeffries*, 110 Wn.2d 326, 752 P.2d 1338 (theft), *cert. denied*, 488 U.S. 948 (1988). Thus, there is no unanimity problem with respect to this aggravating factor.

17. Prosecutorial Misconduct. Lord claims the prosecutor violated his right to due process by failing to disclose that prosecution witness Rex Harvey was in violation of his probation. In a sworn statement, Harvey stated:

> I received several probation violations in early 1987 after my release from the Kitsap County Jail. No action was taken on the probation violations until after I testified in the Brian Keith Lord trial and after that trial was completed. The Kitsap County Prosecuting Attorney Danny Clem constantly reminded me that I was on probation each time that I met with him before the trial. . . . I specifically recalled Clem telling me . . . prior to the trial that if I didn't cooperate, "I'm going to burn you."

PRP app. 22, at 1-2. Lord has also provided this court with a notice to Harvey that he had violated the conditions of his

supervision, and a show cause petition regarding the violation. The notice is dated March 18, 1987, which is before Harvey testified against Lord, and it recommends that Harvey serve 30 days in jail. The show cause petition was filed on August 4, 1987, after Harvey testified, and it asks the court to set a payment schedule for Harvey's financial obligations. Prosecutor Clem denies Harvey's factual allegations, and has provided evidence to support this denial.

Lord requests an evidentiary hearing to determine whether any threats or promises were actually made. Such a hearing is required if the defendant has stated with particularity facts which, if proved, would entitle him to relief. *In re Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992). Such relief would only be available if the failure to disclose such information "deprives the defendant of a fair trial". *United States v. Bagley*, 473 U.S. 667, 678, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). The trial was not fair "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different". *Bagley*, 473 U.S. at 682. The jury was informed of Harvey's five convictions for theft by deception, and his credibility to that extent had been impeached. Moreover, Harvey particularly stated in his affidavit that he refused to change his testimony despite any alleged coercion on the part of the prosecutor. In sum, Lord has not shown that the prosecution's acts denied him a fair trial.

18. Newly Discovered Evidence. Lord alleges that he has new evidence which was previously undiscoverable and which would affect either his conviction or his sentence. Newly discovered evidence is grounds for relief in a personal restraint petition if those facts "in the interest of justice require" vacation of the conviction or sentence. RAP 16.4(c)(3). The standard applied under this rule is the same as that applied to motions for new trial made on the same ground. *See In re Jeffries*, 114 Wn.2d 485, 493, 789 P.2d 731 (1990) (citing *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)). Under that test, the defendant must show:

that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching.

*Williams*, at 223.

 One piece of "new evidence" Lord presents is a report prepared by Dr. Edward Blake in March of 1992. Except with respect to Dr. Blake's DNA analysis (which was not exculpatory), the examination was based on procedures and tests available prior to Lord's trial. Blake simply retested certain exhibits and expressed disagreement with some of the State Crime Laboratory's conclusions. Thus, in addition to the fact that this evidence was available before trial, it is also only cumulative or impeaching.

Lord also offers a Washington State Patrol interoffice communication regarding the internal investigation of Donald Phillips, the crime lab employee who tested the suspected crime scene and subsequently filed false reports to his superiors regarding the procedures he used. The defense was informed before trial of Phillips' testing error and his false statements to his superiors. This court dealt with this problem at length in its decision on direct appeal. *Lord*, at 863-69. The only new allegations Lord now makes deal with the point at which the prosecutor's office actually learned of Phillips' misconduct. This is immaterial; the significant fact is that the misconduct was revealed, and Lord was able to cross-examine Phillips about his testing procedures and his false report to his superiors.

## PENALTY PHASE

19. Criminal History. We rejected on direct appeal a number of Lord's claims regarding the introduction and use of his criminal history in the penalty phase. *Lord*, 117 Wn.2d at 896-97, 889-95. Lord now claims that his juvenile adjudication of guilt is not a "conviction" at all and is therefore inadmissible under *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983), *adhered to on remand*, 101 Wn.2d 631, 683 P.2d

1079 (1984). He also raises other evidentiary challenges to the admission of the juvenile matter and accuses his prior attorneys of representing him ineffectively by not raising these issues. Although most of his contentions on this issue are merely reworked versions of his original arguments on appeal,[8] we will consider the *Bartholomew* issue and his challenge to the false imprisonment conviction.

Lord has submitted several appendices to show that California law does not treat juvenile adjudications as "convictions".[9] PRP apps. 1–6. It does not matter if the adjudicationis technically a "conviction", however. One of the "rele-

---

[8]Specifically, Lord claims the State failed to present adequate evidence to prove the existence or validity of the juvenile conviction and that the record does not affirmatively show that the juvenile court found him guilty beyond a reasonable doubt or advised him of his right to appeal. The State presented copies of the juvenile court order finding Lord guilty of second degree murder. *See* PRP app. 5. The order shows Lord was represented by counsel, the State's witnesses testified under oath and were cross-examined, defense witnesses were called, Lord exercised his right to remain silent, and the trial judge found Lord guilty of second degree murder. Clearly, despite Lord's claim that no "conviction" exists, these documents prove there was an adjudication of guilt. As to his other contentions, Lord cannot rely solely on the silence in the record on these matters, but must present some affirmative evidence that he was ignorant of his rights and that the court applied the wrong standard of proof. *See In re Harris*, 111 Wn.2d 691, 696-98, 763 P.2d 823 (1988), *cert. denied*, 490 U.S. 1075 (1989); *In re Runyan*, 121 Wn.2d 432, 449-50, 853 P.2d 424 (1993). These matters were also addressed on appeal. *Lord*, 117 Wn.2d at 896-97.

[9]Lord further claims the adjudication cannot be considered because it was set aside automatically upon his completion of probation. The California statute Lord cites says a juvenile is relieved from "all penalties or disabilities" arising from an adjudication of guilt if he is honorably discharged from control of the Youthful Offender Parole Board. Cal. Welf. & Inst. Code § 1179(a). Lord presents no evidence of such an "honorable discharge"; to the contrary, the evidence shows that Lord has committed several violations of his probation and committed his prior adult felony while still on probation. State's Answer to PRP apps. P, T. Moreover, the phrase "penalties and disabilities" in the California statute does not include use of the juvenile adjudication to enhance the defendant's sentence for an adult offense. *People v. Shields*, 228 Cal. App. 3d 1239, 279 Cal. Rptr. 403 (1991); *People v. Jacob*, 174 Cal. App. 3d 1166, 220 Cal. Rptr. 520 (1985). Finally, such adjudications are admissible in the penalty phase of a California capital trial. *People v. Frierson*, 53 Cal. 3d 730, 808 P.2d 1197, 280 Cal. Rptr. 440 (1991), *cert. denied*, 112 S. Ct. 944 (1992); *People v. Burton*, 48 Cal. 3d 843, 771 P.2d 1270, 258 Cal. Rptr. 184 (1989), *cert. denied*, 494 U.S. 1039 (1990).

vant factors" the jury is to consider in the penalty phase of a capital case is "[w]hether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity". RCW 10.95.070(1). The issue in *Bartholomew* was whether the defendant's "criminal history" included alleged criminal conduct for which he had never been charged or convicted. *Bartholomew*, 98 Wn.2d at 196-97. We concluded that "[i]nformation relating to defendant's criminal past should . . . be limited to his record of convictions". *Bartholomew*, at 197. Although we used the word "convictions", it was meant only to distinguish *allegations* of criminal activity from *adjudications* of guilt, not adult convictions from findings of guilt in juvenile proceedings. *See also In re A,B,C,D,E*, 121 Wn.2d 80, 87, 847 P.2d 455 (1993) (noting that juvenile court adjudications of guilt are treated as "convictions" for several purposes, including criminal history).

██ Lord also did not challenge the admission of the false imprisonment conviction on direct appeal. He now claims the conviction is constitutionally invalid. As with the juvenile adjudication, Lord relies on perceived deficiencies in the record of the conviction; he makes no affirmative claim of ignorance of his rights, the elements of the crime, or the penalties he was facing. Lord has, therefore, failed to meet his burden of proof on this issue. *In re Harris*, 111 Wn.2d 691, 696-98, 763 P.2d 823 (1988) (rejecting similar challenge to prior conviction admitted in penalty phase of capital case), *cert. denied*, 490 U.S. 1075 (1989). We find no error in the admission of either conviction in the penalty phase.

██ 20. <u>Evidence</u>. Lord claims the trial court erred in admitting the guilt phase exhibits in the penalty phase. This argument is patently frivolous. It is well settled that all evidence which is admissible in the guilt phase is also admissible in the penalty phase. *Bartholomew*, 101 Wn.2d at 643; *State v. Mak*, 105 Wn.2d 692, 720-21, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert.*

*denied*, 113 S. Ct. 1363 (1993). Lord presents no compelling arguments why such established precedent should be re-examined.

21. Penalty Phase Instructions. Lord claims the penalty phase instructions improperly permitted the jury to treat his dangerousness as an aggravating factor, erroneously permitted "double counting" of aggravating factors, erroneously allowed the jury to consider "any relevant factors" instead of "relevant mitigating factors", required the jury to find more than one mitigating factor in order to vote against the death penalty, improperly required the jury to reach a unanimous verdict, and omitted reference to the "presumption of leniency".

"[T]he proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an improper manner. *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990). However, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde*, 494 U.S. at 378 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 94 S. Ct. 396 (1973)). This court has already rejected similar challenges to indistinguishable instructions given in other death penalty cases. *In re Rice*, 118 Wn.2d 876, 894-96, 828 P.2d 1086 (unanimity, more than one mitigating factor), *cert. denied*, 121 L. Ed. 2d 344 (1992); *State v. Mak*, 105 Wn.2d 692, 740-60, 718 P.2d 407 (presumption of leniency, unanimity, "relevant factors", double counting of factors), *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993); *State v. Jeffries*, 105 Wn.2d 398, 421, 717 P.2d 722 ("relevant factors"), *cert. denied*, 479 U.S. 922 (1986); *State v. Rupe*, 108 Wn.2d 734, 763, 743 P.2d 210 (1987) ("relevant factors", unanimity), *cert. denied*, 486 U.S. 1061 (1988); *State v. Campbell*, 103 Wn.2d 1, 27-28, 691 P.2d 929 (1984) ("relevant factors"), *cert. denied*, 471 U.S. 1094 (1985); *State v. Rupe*, 101 Wn.2d

664, 701, 708-10, 683 P.2d 571 (1984) ("relevant factors");
*State v. Frampton*, 95 Wn.2d 469, 489, 627 P.2d 922 (1981)
("future dangerousness" is not unconstitutionally vague).
The instructions, taken as a whole, appear adequate.

■■ Lord contends, however, that the Ninth Circuit
has found that instructions identical to those given here
contained an incorrect statement of law which, taken alone,
might have improperly suggested that the jury had to reach
a unanimous outcome in the penalty phase. *Mak v. Blodgett*,
970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363
(1993). It is instruction number 6 upon which the dispute
centered in *Mak*, and which Lord now contests. Lord's argu-
ment is patently frivolous. The instruction given in Lord's
trial differs significantly from that given in *Mak*. Lord's
instruction 6 read as follows:

> You must answer one question. All twelve of you must agree
> before you answer the question "yes" or "no". *If you do not
> unanimously agree then answer "unable to unanimously agree".*
> Fill in the answer to the question in the verdict form to express
> your decision . . ..

(Italics ours). CP, at 675. The addition of the italicized
language in the above instruction cures the problems found
by the Ninth Circuit in *Mak*.[10] These instructions, taken as
a whole, allowed each individual juror to consider any factor
he or she felt was mitigating whether or not any of the other
jurors agreed it had been proved or was mitigating. *See
Campbell v. Kincheloe*, 829 F.2d 1453, 1466 (9th Cir. 1987)
(noting that Washington's statute "imposes no limits on the
mitigating evidence a capital defendant may introduce"),
*cert. denied*, 488 U.S. 948 (1988). These instructions were
entirely proper and did not prejudice the defendant in any
way.

---

[10]Moreover, the Ninth Circuit found that a lone instructional error would "be
tolerable were it the only error in the sentencing proceeding . . .." *Mak*, 970 F.2d
at 625. Because the court found additional errors which on their own required
remand, the Ninth Circuit instructed the trial court to also correct the instructional
error at resentencing. *Mak*, 970 F.2d at 625. We agree with the Ninth Circuit that
minor instructional errors do not necessitate resentencing.

■ 22. <u>Constitutionality of Death Penalty Statute</u>. Lord contends that RCW 10.95.020, which defines aggravated murder, violates article 2, section 37 of our constitution because it incorporates the premeditated murder statute by reference, without setting it out in full. Article 2, section 37 says, "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length". RCW 10.95.020 does not amend or revise RCW 9A.32.030(1)(a). It simply says that aggravated murder is "first degree murder as defined by RCW 9A.32.030(1)(a), as now or hereafter amended", plus one or more specified aggravating factors. "It is well established that Const. art. 2, § 37 is not violated when a complete act adopts by reference provisions of prior acts". *Steele v. State*, 85 Wn.2d 585, 591, 537 P.2d 782 (1975). *See also State ex rel. State Toll Bridge Auth. v. Yelle*, 32 Wn.2d 13, 200 P.2d 467 (1948). The adoption by reference of the first degree murder statute into RCW 10.95.020 therefore does not violate article 2, section 37 of our constitution.

■ 23. <u>Death by Hanging</u>. Lord contends that hanging is an unconstitutional method of execution. This court rejected identical contentions in *State v. Frampton*, 95 Wn.2d 469, 512-14, 627 P.2d 922 (1981) (opinions of Rosellini, J., and Stafford, J.); *State v. Rupe*, 101 Wn.2d 664, 701, 683 P.2d 571 (1984); and *State v. Campbell*, 112 Wn.2d 186, 192, 770 P.2d 620 (1989). Other state courts have also concluded that hanging does not involve the infliction of pain beyond that necessary for the extinguishment of human life. *DeShields · v. State*, 534 A.2d 630 (Del. 1987), *cert. denied*, 486 U.S. 1017 (1988); *State v. Coleman*, 185 Mont. 299, 605 P.2d 1000 (1979), *cert. denied*, 446 U.S. 970 (1980); *State v. Kilpatrick*, 201 Kan. 6, 439 P.2d 99 (1968). Having already decided that death by hanging is not an unconstitutional punishment, we need not now revisit the issue. Moreover, we note that Lord will not be hanged if he selects the lethal injection alternative, RCW 10.95.180, which is undoubtedly constitutional.[11]

---

[11]The Ninth Circuit, sitting en banc, also has considered the claim that hanging is unconstitutional, and recently held that "judicial hanging, as conducted under the Washington Field Instruction, does not involve the wanton and unnecessary

## MOTIONS

1. <u>Expenditure for Experts</u>. Lord requests this court to authorize an expenditure of public funds to enable him to hire a jury consultant to determine whether the jury instructions were understandable, an investigator to locate and interview numerous witnesses, and a fetal alcohol syndrome expert to determine if trial counsel was ineffective by failing to present mitigating evidence on this issue. Lord contends that he needs to hire these persons in order to meet his burden of showing that he has competent, admissible evidence to support his claims of error. *See In re Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992). He cites no authority, however, which suggests that expert services must be provided in postconviction proceedings.

At the trial court level, the appointment of experts is treated as part of the defendant's constitutional right to the assistance of counsel. *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985); CrR 3.1. There is no absolute constitutional right to counsel in postconviction proceedings, even in death penalty cases. *Coleman v. Thompson*, 501 U.S. 722, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991). Thus, the Sixth Amendment provides no support for Lord's request for funds.

RAP 16.15(g) gives the appellate court discretion to appoint counsel for a personal restraint petitioner and also to authorize "payment of such other expenses as may be necessary to consider the petition in the appellate court". This rule permits this court to authorize expenditures for expert witnesses and other services. In fact, the court autho-

---

infliction of pain, and therefore does not violate the Eighth Amendment". *Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) (en banc). Moreover, any finding that hanging is an impermissible method of execution would only mean that the defendant's sentence would be carried out by lethal injection. RCW 10.95.180. A similar finding that lethal injection is an unconstitutional method of execution would be tantamount to forbidding the death penalty altogether. The Supreme Court has already concluded that the death penalty itself does not invariably violate the Constitution. *Gregg v. Georgia*, 428 U.S. 153, 169, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976).

rized payment of a forensics expert who re-examined numerous exhibits in the present case. However, we do not find that these additional expenditures are necessary to our consideration of this personal restraint petition.

■ Specifically, Lord wants to hire a fetal alcohol syndrome expert in order to seek information to support his claim of ineffective assistance of counsel. Motion To Employ Fetal Alcohol Syndrome Expert (Feb. 10, 1993), at 1. Lord's trial counsel spoke to several of Lord's family members and were aware he had psychological problems, and they called a neuropsychologist in the penalty phase to describe those problems. Since there is no evidence that counsel had reason to believe that Lord's mother drank while she was pregnant with Lord, counsel's failure to tie Lord's psychological problems to the fetal alcohol syndrome would not, as a matter of law, be considered unreasonable or ineffective. *See Burger v. Kemp*, 483 U.S. 776, 794-95, 97 L. Ed. 2d 638, 107 S. Ct. 3114 (1987). His requested expenditure for a fetal alcohol syndrome expert is denied.

■ Lord also wishes an expert jury consultant to assist counsel in supporting their contention that the jury instructions are too confusing for the average juror to understand. Lord made a very similar claim on direct appeal and submitted a computer-generated evaluation of the jury instructions which concluded that they were extremely difficult to comprehend. This court held that the complexity of the instructions was not objected to at trial, did not constitute an error of constitutional magnitude, and therefore could not be raised for the first time on appeal. *Lord*, 117 Wn.2d at 881. This court also noted that virtually identical instructions had previously been found to be satisfactory. *Lord*, 117 Wn.2d at 881 n.13. An expert's conclusion that the instructions are confusing would not change the nature of Lord's claim so as to allow him to raise it in a postconviction proceeding. Moreover, "[t]he individual or collective thought processes leading to the verdict 'inhere in the verdict' and cannot be used to impeach a jury verdict." *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988); *State v. Whitney*, 96

Wn.2d 578, 580 n.1, 637 P.2d 956 (1981); *State v. Crowell*, 92 Wn.2d 143, 146, 594 P.2d 905 (1979). Thus, one of Lord's own jurors could not impeach the verdict by claiming he or she misunderstood the instructions. *State v. McKenzie*, 56 Wn.2d 897, 900, 355 P.2d 834 (1960). It would be somewhat anomalous to allow the verdict to be impeached with evidence that members of the public who were not jurors, but who participated in an empirical study of jury instructions, would have misunderstood the same instructions.[12] Lord's request to expend funds to hire a jury consultant is denied.

Finally, Lord wants funds to employ an investigator to "acquire information about the full scope" of the internal investigation of Donald Phillips. Motion To Employ Investigator (Feb. 10, 1993), at 1. How the internal investigation of Phillips' misconduct was handled is irrelevant to Lord's guilt or innocence or to any penalty phase issue. His request to expend funds to hire this expert is denied.

2. State's Motion To Strike. The State asks this court to strike appendices 2, 3, 4, 18, and 54 to Lord's petition, references to these appendices throughout the petition, argument based on "judicially forbidden post-verdict contact with jurors", and citations to two Louisiana cases the State claims were unpublished decisions. State's Motion To Strike (Feb. 16, 1993), at 2. The appendices in question contain statements of California attorneys regarding the legal effect of a juvenile court adjudication of guilt, opinions of two Washington attorneys regarding the conflict of interest issue, and investigator Paul Henderson's conversation with juror Rosario. Since none of the attorneys' statements proved necessary (or even particularly helpful) to the disposition of any legal issue, no purpose would be served in striking them. With respect to Henderson's declaration, there is in fact no court order prohibiting contact with Lord's jurors. There is,

---

[12]The District Court in *United States ex rel. Free v. Peters*, 806 F. Supp. 705 (N.D. Ill. 1992) held that a study of this sort established that Illinois' pattern instructions for capital cases confuse jurors with respect to unanimity and consideration of nonstatutory aggravating factors. In a later case, however, the Seventh Circuit expressly rejected the District Court's analysis. *Gacy v. Wellborn*, 994 F.2d 305 (7th Cir. 1993).

therefore, no basis for striking the declaration. Finally, the Louisiana cases were in fact published, so there is no basis for striking the citations to them. The State's motion to strike is denied.

### ISSUES ALREADY RAISED ON APPEAL

■ This court has given full consideration to every issue raised by the petitioner. Nonetheless, we find many of the issues raised in this PRP to be obvious attempts to get this court to reconsider issues it had already addressed on direct appeal. "Simply 'revising' a previously rejected legal argument . . . neither creates a 'new' claim nor constitutes good cause to reconsider the original claim". *In re Jeffries*, 114 Wn.2d 485, 488, 789 P.2d 731 (1990). As the Ninth Circuit recently explained, a "petitioner may not create a different ground [for relief] merely by alleging different facts, asserting different legal theories, or couching his argument in different language". *Campbell v. Blodgett*, 982 F.2d 1321, 1326 (9th Cir. 1992), *reh'g denied, amended and superseded*, 997 F.2d 512 (1993). A personal restraint petition is not meant to be a forum for relitigation of issues already considered on direct appeal, but rather is reserved for consideration of fundamental errors which actually prejudiced the prisoner. *See In re Runyan*, 121 Wn.2d 432, 453-54, 853 P.2d 424 (1993). We find that the following issues were adequately considered in the direct appeal, do not constitute fundamental errors which sufficiently prejudice the petitioner such that reconsideration is necessary, and may be summarily disposed of now.

1. Continuance. Lord claims that the trial court violated his right to due process and to effective assistance of counsel by denying a defense motion for a continuance and allowing "the prosecution to continue its discovery during trial and allow[ing] evidence developed during this period to be admitted into evidence". PRP, at 250. On direct appeal, Lord also assigned error to the trial court's failure to limit discovery once trial started. This was among the "number of other issues" which this court reviewed and found not to "merit individual attention". *Lord*, 117 Wn.2d at 916.

2. <u>Ineffective Assistance of Trial Counsel.</u> With respect to the effectiveness of his trial counsel, this court rejected Lord's contention on appeal that trial counsel represented him ineffectively by, among other things, failing to call witnesses who claimed to have seen the victim alive the day after the State's evidence indicated she had been killed, and making an inadequate closing argument. *Lord*, 117 Wn.2d at 883-86. Lord now claims that his trial counsel generally represented him ineffectively by failing to conduct an adequate investigation, failing to call an additional witness to impeach one of the State's witnesses and failing to present certain mitigating evidence in the penalty phase. Lord specifically alleges that the trial court denied him his right to effective representation by denying his request to fire Ron Ness, one of his two trial counsel, that Ness' representation was ineffective because Ness had previously represented one of the State's witnesses, Rex Harvey, and that Ness represented him ineffectively by being absent during the prosecutor's penalty phase closing argument and so failed to make objections during that argument. Finally, Lord claims the trial court's failure to release all of the crime lab's internal investigative reports denied him his right to effective assistance of counsel.

After examining the record and investigating Lord's claims, we find nothing new of substance to consider. Defense counsel vigorously defended Lord, and we do not find that any of these newly raised allegations, even if proved, would rise to the level of a fundamental error necessitating retrial or resentencing. In sum, petitioner has neither raised any substantially new issues regarding the competence of his representation at trial, nor has he been able to show any prejudice resulting from the same.

3. <u>Hammer and Trace Evidence.</u> Lord·claims the trial court erred in admitting evidence regarding the hammer, the trace evidence connecting Lord with the murder, and the charts summarizing the trace evidence.[13] These

---

[13]Lord's principal argument is that the chart precluded the jury from treating "residual doubts" as to his guilt as a mitigating factor. PRP, at 74. Residual doubt

issues were dealt with at length in this court's decision on direct appeal. *Lord*, 117 Wn.2d at 849-70.

4. Alcohol and Marijuana Use. Lord claims the trial court erred in admitting evidence of his alcohol and marijuana use. This issue was raised as an ER 403 and 404(b) issue on direct appeal. This court found no error. *Lord*, 117 Wn.2d at 872-73. Lord now claims the same rulings denied him due process of law. We find no independent merit to his contention.

5. Sufficiency of the Evidence. Lord claims the State failed to prove all the elements of aggravated first degree murder. Lord challenged the sufficiency of the evidence of identity, premeditation, and reliability of the State's evidence on direct appeal. This court found sufficient evidence to prove that he committed a premeditated murder and that the victim was raped, thus making the killing an aggravated first degree murder. *Lord,* 117 Wn.2d at 882-83. The court declined to "inquire further as to if the evidence was also sufficient to establish kidnapping". *Lord*, 117 Wn.2d at 883. The court also rejected Lord's challenges to the reliability of the State's scientific evidence. *Lord*, 117 Wn.2d at 850-54. Although he has refashioned his claim based on California case law, it remains the same proposition rejected on appeal.

6. Scope of Cross Examination. Lord claims the trial court improperly limited the scope of cross examination as to prosecution witnesses Rex Harvey, Don Phillips and Sonny Belgard. These contentions were considered and rejected on direct appeal. *Lord*, 117 Wn.2d at 869-70, 873-75.

7. Prosecutorial Misconduct. Lord alleges prosecutorial misconduct based on statements made by the prosecutor in the penalty phase closing argument. This court rejected Lord's challenge to the prosecutor's penalty phase argument on direct appeal. *Lord*, 117 Wn.2d at 904-05.

8. Penalty Phase Evidence. Lord claims it was error to preclude him from presenting evidence of other similar

---

as to the defendant's guilt is not one of the "relevant factors" listed in RCW 10.95.070 (or the jury instructions), nor does the constitution require that it be treated as a mitigating factor. *Franklin v. Lynaugh*, 487 U.S. 164, 101 L. Ed. 2d 155, 108 S. Ct. 2320 (1988).

cases in which the defendant did not receive the death penalty. This court rejected Lord's claim regarding sentences in other cases on direct appeal. *Lord*, 117 Wn.2d at 829, 914; *accord Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir. 1986) (evidence of co-defendant's life sentence relevant only to judicial proportionality review), *cert. denied*, 481 U.S. 1042 (1987).

9. Cross Examination at Allocution. Lord claims the trial court erred in allowing the prosecutor to cross-examine Lord after he exercised his right of allocution. This court rejected this contention on direct appeal. *Lord*, 117 Wn.2d at 897-900.

10. Passion or Prejudice. Lord claims his death sentence is the result of passion or prejudice. This court held otherwise on direct appeal. *Lord*, 117 Wn.2d at 915.

11. Criminal History. Lord claims error in admitting his criminal history in the penalty phase and in allowing cross examination of his father on that subject. Both of these issues were dealt with and rejected on direct appeal. *Lord*, 117 Wn.2d at 896-97, 889-95.

12. Cumulative Errors. Finally, Lord contends that, even if none of the claimed errors set forth in his 387-page personal restraint petition by themselves require reversal, the cumulative error was so prejudicial as to require a new trial. *See Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.) (errors may cumulatively produce a trial that is fundamentally unfair), *cert. denied*, 464 U.S. 962 (1983). This issue was raised and rejected on direct appeal, albeit as a question of passion or prejudice. *Lord*, 117 Wn.2d at 915. This PRP has similarly failed to demonstrate an accumulation of error of such magnitude that resentencing or retrial is necessary.

## Conclusion

After thoroughly considering each and every claim brought by petitioner Brian Keith Lord, and conducting a complete and independent evaluation of the record and supporting evidence, we can find no reversible error in either

Lord's conviction of aggravated first degree murder or his sentence of death. Therefore, we deny the petition.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

UTTER, J. (dissenting) — Errors at the penalty phase of a capital case are subject to heightened judicial scrutiny. *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992). Applying this heightened scrutiny, I believe the errors made during the penalty phase denied Lord a fundamentally fair sentencing proceeding.

The trial court erred in sending the State's evidentiary chart into the jury room, in permitting the State to introduce evidence about the circumstances surrounding Lord's prior convictions, in cross-examining him after allocution, and in instructing the jury it needed to be unanimous before answering "yes" or "no" to the question whether the death penalty should be imposed. I have already discussed these issues at length in my dissent in Lord's direct appeal, *see Lord*, 117 Wn.2d at 918-46, and only briefly reiterate my concerns here. Finally, I disagree with the majority that death by hanging is permissible in Washington.

## SUMMARY CHART

The majority finds the defendant's argument that the summary chart should not have been introduced at the penalty phase frivolous. As grounds for this characterization of the argument, the majority notes that in Lord's direct appeal this court held the chart's introduction was not reversible error at the guilt phase. The majority also cites the general rule that exhibits which are introduced at the guilt phase may be introduced at the penalty phase. Majority, at 322 (citing *State v. Bartholomew*, 101 Wn.2d 631, 643, 683 P.2d 1079 (1984)); *State v. Mak*, 105 Wn.2d 692, 720-21, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v.*

*Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993).

The majority's citations do not support the conclusion that Lord's argument is "patently frivolous". It is true a majority of this court held it was not *reversible* error to send the chart into the jury room at the guilt phase. *See State v. Lord*, 117 Wn.2d 829, 861-62, 822 P.2d 177 (1991), *cert. denied*, 121 L. Ed. 2d 112 (1992). The majority did however recognize that generally charts should not be sent into the jury room. *See Lord*, 117 Wn.2d at 861. Concluding the chart's presence in the jury room at the *guilt* phase was not reversible error does not dispose of the question whether sending the chart into the jury room in the *penalty* phase is reversible.

Even assuming the majority is correct as to the guilt phase, I believe the effect of the chart's admission at the penalty phase must be independently evaluated. Such separate analysis is appropriate because we examine the penalty phase of a capital case with heightened scrutiny. *See Lord*, 117 Wn.2d at 888 (citing *Johnson v. Mississippi*, 486 U.S. 578, 584, 100 L. Ed. 2d 575, 108 S. Ct. 1981 (1988)); *State v. Bartholomew*, 101 Wn.2d at 638 (citing *Gardner v. Florida*, 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977)); *Caldwell v. Mississippi*, 472 U.S. 320, 329, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985).

It is true that evidence admissible in the guilt phase is generally admissible in the penalty phase. *See, e.g., Bartholomew*, 101 Wn.2d at 643. Nevertheless, matters that are highly prejudicial and of questionable relevance that should be excluded in criminal trials under ER 403 should not be admitted in the penalty phase of a capital case. *See Bartholomew*, 101 Wn.2d at 641.

A court examining a due process challenge to the admissibility of evidence should evaluate whether the probative value of the evidence outweighs its prejudice to the accused:

> When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then the use of such evidence by a state may rise to the posture of the denial of fundamental fairness and due process of law.

*United States ex rel. Palmer v. DeRobertis*, 738 F.2d 168, 171 (7th Cir. 1984) (quoting *United States v. Pate*, 426 F.2d 1083, 1086 (7th Cir. 1970), *cert. denied sub nom. Durso v. Pate*, 400 U.S. 995, 27 L. Ed. 2d 445, 91 S. Ct. 469 (1971)).

The State's chart was not relevant to the jury's deliberations in the penalty phase. There, the relevant inquiry is whether there are sufficient mitigating circumstances to merit leniency. *See* RCW 10.95.070. Moreover, the chart's potential for prejudice should not be lightly discounted at a stage in which the defendant is subject to the harshest penalty available under our sentencing scheme. *See Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); *Beck v. Alabama*, 447 U.S. 625, 638, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980); *Gardner v. Florida*, 430 U.S. at 357. At the very least, the chart distracted the jury from properly focusing on the question whether Lord had shown sufficient mitigating circumstances to warrant leniency.

Under these circumstances, the erroneous admission of the State's summary chart, which consisted of irrelevant and prejudicial matters, denied Lord a fundamentally fair proceeding and therefore denied him due process of law.

### SCOPE OF EVIDENCE OF PRIOR CONVICTIONS

The trial court also erred in permitting the State to introduce before the jury evidence about the circumstances of Lord's prior murder and unlawful imprisonment convictions.

In the penalty phase, the State elicited testimony that the victim in Lord's juvenile adjudication for murder was a close family friend, was shot with two guns, and was shot in the stomach while she was using the telephone to summon help. Report of Proceedings, at 7731-32, 7780-81, 7863. The State also elicited testimony that the victim of Lord's unlawful imprisonment conviction was his 13- or 14-year-old sister-in-law, that he assaulted her in his automobile, and that she sustained injury at his hands. See Report of Proceedings, at 7736-38.

The admissibility of prior convictions under RCW 10.95-.070 does not give the State license to expose the jury to the facts and circumstances attending those convictions. *See Bartholomew*, 101 Wn.2d at 640-41. *Cf. Lord*, 117 Wn.2d at 889-90. This court has expressly rejected the notion that cross examination may be conducted indiscriminately. *Bartholomew*, 101 Wn.2d at 643. ("We do not intend . . . that the prosecution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental.") (quoting *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170, *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983)). In deciding whether to admit the prosecutor's evidence, the trial court is required to apply a balancing test similar to that contemplated by ER 403. *Bartholomew*, 101 Wn.2d at 643 (citing *Bartholomew*, 98 Wn.2d at 197-98).

As I already indicated in my dissent in *Lord*, the State used the statement by Lord's father that Lord was a "good boy" to introduce evidence of his prior bad acts. Such evidence could not have been properly admitted in a criminal trial under the Rules of Evidence. *See* ER 405. Lord's father was not introducing character evidence about his son. He was rather expressing his affection for him, making rebuttal evidence improper. *State v. Lord*, 117 Wn.2d 829, 927-30, 822 P.2d 177 (1991) (Utter, J., dissenting), *cert. denied*, 121 L. Ed. 2d 112 (1992).

The State's introduction of statements about Lord's prior bad acts violated RCW 10.95.070 as construed by *State v. Bartholomew*, 101 Wn.2d 631, 643, 683 P.2d 1079 (1984). It was also unwarranted under the Rules of Evidence. Finally, some of the information elicited by the State was inadmissible as hearsay. See Report of Proceedings, at 7731-32. The procedural protections attending criminal prosecutions should be conscientiously applied, rather than suspended, in the context of a capital proceeding. *See Beck v. Alabama*, 447 U.S. 625, 635-38, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980).

There can be no doubt the references to the circumstances pertaining to Lord's juvenile adjudication and his prior criminal convictions were both legally unwarranted and exceedingly prejudicial. Under these circumstances, the majority's conclusion that Lord has not shown prejudice is unjustified, particularly in the context of a death penalty proceeding. It is critically important to both the defendant and the community that a decision to impose the death sentence be based upon reason rather than caprice or emotion. *See Gardner v. Florida*, 430 U.S. 349, 358, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977).

The trial court also erred in permitting the State to cross-examine Lord after his allocution. For the reasons set forth in my dissent in Lord's direct appeal, doing so is improper. *See Lord*, 117 Wn.2d at 936-39 (Utter, J., dissenting).

JURY UNANIMITY WITH RESPECT TO IMPOSING THE DEATH PENALTY

Finally, the Ninth Circuit has held that an instruction suggesting the jury must be unanimous before finding insufficient mitigating circumstances to merit leniency constitutes error. *See Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993). In *Mak* the instruction was "All twelve of you must agree before you answer a question 'yes' or 'no.' " In this case, the instructional infirmity was similar. The court instructed the jury as follows: *"You must answer one question "yes" or "no".* If you do not unanimously agree then answer "unable to unanimously agree". (Italics mine.) Clerk's Papers, at 675. In view of the *Mak* court's disapproval of this type of instruction, I believe the flaw in the instruction here, combined with the other errors indicated above, denied Lord a fundamentally fair sentencing proceeding. Accordingly, I would reverse his sentence and remand for a new sentencing proceeding consistent with the law as set forth here.

DEATH BY HANGING

I also take exception to the majority's citation of *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981) for the propo-

338

sition that hanging is a permissible method of execution. Majority, at 325. A careful reading of *Frampton* indicates that a majority of the court only held there was *insufficient undisputed evidence* to warrant holding hanging unconstitutional. *See Frampton*, 95 Wn.2d at 512, 514.

*Frampton* is not controlling because its discussion of hanging is dicta. Likewise not binding is the comment in *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984) that *Frampton* "rejected the argument that death by hanging was unconstitutional". 101 Wn.2d at 701. Itself dictum, this statement does not alter the fact that the discussion in *Frampton* is dicta. *State v. Campbell*, 112 Wn.2d 186, 192, 770 P.2d 620 (1989) is not controlling either. *Campbell* only refused to reconsider *Frampton*, which we have already seen did not establish controlling law on the constitutionality of hanging.

It is, moreover, critical to understand that the court's discussion of hanging in *Frampton* was in part based on a misapprehension that death was rapid and virtually painless because the spinal cord was severed in the drop, a condition that was thought to produce almost instantaneous loss of consciousness and death shortly thereafter. More recent medical and scientific evidence reveals this assumption to be false. In most cases, the spinal cord is not severed, and death can be relatively slow and agonized. *See State v. Dodd*, 120 Wn.2d 1, 30, 838 P.2d 86 (1992) (Utter, J., dissenting); *see also, e.g.*, R. James & R. Nasmyth-Jones, *The Occurrence of Cervical Fractures in Victims of Judicial Hanging*, 54 Forensic Sci. Int'l 81, 90-91 (1992); I. Gray & M. Stanley, *A Punishment in Search of a Crime* 22-29 (1989); *An Unnatural Way To Die*, New Scientist, Oct. 27, 1983, at 278.[14]

---

[14]I note a divided Ninth Circuit of the United States Court of Appeals, sitting en banc, has recently concluded death by hanging is not unconstitutional. *See Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994). For the reasons amply set forth in the sources cited above, and in the dissent in *Campbell*, I disagree.

For the reasons just set forth, the majority's conclusion that hanging is a constitutionally permissible method of execution is unwarranted.